surreptitiously or fraudulently abstracted, whether they are held under circumstances which make them government obligations at all, is a judicial, not an administrative, question. Facts to be ascertained and found by a jury. and rules of law to be declared by a court, are involved in the inquiry.

The theory of the charge in this case may be stated to be, that it was not the intention of the act of congress to confer upon the secretary of the treasury or his subordinate officers the exercise of judicial powers in this respect; that it was not for them to inquire into those questions of notice, bona fides, or payment of value, upon which the ultimate liability of the government to pay notes thus fraudulently abstracted from the treasury would depend. As to notes actually issued by the secretary of the treasury, no question of liability could arise. For retiring those he was authorized, at once and summarily, to use the proceeds mentioned in the act. As to any others, the holders would, at maturity, have such recourse to the government, through congress or the court of claims, as the laws will warrant, and would have such relief as might be justly due. Not only so, the investigation which might then be had, and the disclosures which, in such investigation, might be compelled, might result in enabling the government to reach the fraudulent parties, even though it should be deemed bound to pay the amounts to innocent holders. There were, therefore, reasons, and important reasons, for the discrimination in question. Congress should not be deemed to have invested the secretary of the treasury, or his subordinates, with such extraordinary, summary, judicial powers—powers which might operate to increase the public debt, if erroneously exercised, and that in the face of the express limitation in the same statute, which declares that the public debt shall not be thereby increased. The authority to retire these notes is a special statute authority, and is not to be extended by construction; and especialy so in view of the considerations above suggested. The meaning of the word "issued" is satisfied by the construction given to it in the charge. It imports an official act, not the possible legal effect of a felonious or fraudulent abstraction. For illustration of the strictly legal question, it may be supposed, that, after the preparation, in full and complete form and detail for issue, of six hundred millions of notes, or any other amount, one-half were negotiated by the secretary of the treasury, but the other half were fraudulently abstracted from his office—reasons of obvious importance to the government might suggest the propriety, not only of giving every possible description of notice and warning to put the community on their guard, but of at once retiring all that were duly issued, by substituting other obligations distinguishable therefrom. An act, simply authorizing that, should not lightly be construed to authorize, also, the retiring of

the others, if found in the hands of persons claiming to be bona fide holders for value without notice. It may be true, that, in such an act, it would be fitting and proper to declare the discrimination in clear and distinct terms; but, if the terms used were such as could be satisfied by excluding the notes so fraudulently abstracted, courts would be reluctant to hold that it intended to authorize the secretary of the treasury, or his subordinates, to sit as court and jury, to try the question, with each holder, whether he had received such paper under such circumstances that, upon the principles of commercial law, the government was liable thereon. No special circumstances of this kind are known to the court to have led to the act now under consideration; and yet, if the act is satisfied by limiting the authority of the secretary of the treasury, in the performance of this gratuitous and voluntary act, to notes which were in fact issued, it may be the duty of courts, in view of the considerations suggested, to give it that limitation.

These views are of such force and significance as to warrant my conclusion, upon the whole case, that it is my duty to affirm the judgment.

[NOTE. The rule of the commercial law, that if one accepts forged paper purporting to be his own, and pays it to a holder for value, he cannot recall the payment, is applicable as well to the United States as to individuals.

[If the notes were in fact counterfeit, their receipt by the assistant treasurer, and his payment therefor, did not preclude the United States from receiving back the money paid.

[If the notes were printed by the treasury department, and all ready for issue, yet, if they were not in fact issued, the United States could recover. The issue to bind the government must be the physical act of an authorized officer.

[The act of April 12, 1866 (14 Stat. 31), authorized the retirement of all outstanding notes of the class in question which the government would be required to meet at maturity.

[Synopsis of the opinion of the majority of the supreme court, delivered by Mr. Chief Justice Waite, reversing the circuit court decree on the writ of error brought by the defendants. Cooke v. U. S., 91 U. S. 389.]

COOKE (UNITED STATES v.). See Cases Nos. 14,854 and 14,855.

## Case No. 3,179.
### COOKE v. VOSS.
[1 Cranch, C. C. 25.][1]
Circuit Court, District of Columbia. July Term, 1801.

EJECTMENT—PLEADING—PROOF.

In ejectment upon re-entry for non-payment of rent by tenant in fee, the plaintiff need not show that his own title was in fee, if he shows a possession of forty-four years; nor that there were not sufficient goods on the premises, within the first thirty days after the rent became

[1] [Reported by Hon. William Cranch, Chief Judge.]

due, whereof distress might be made; nor that he demanded the rent on the day it became due; nor on what part of the lot the rent was demanded.

At law. The jury found a special verdict, which stated, that William Thornton Alexander and those under whom he claimed, were seized and possessed of the lot of land in the declaration mentioned for the space of about forty-four years next before the 25th December, 1794, and being so seized and possessed on the said 25th December, 1794, by deed of bargain and sale of that date, conveyed the said lot to the said Stephen Cooke, the lessor of the plaintiff, who being seized and possessed thereof on the 25th of May, 1795, by his deed of that date, conveyed the same to Edward Ramsay in fee simple, he "yielding and paying for the same on the first day of January yearly £16 Virginia currency as an annual rent to the said Stephen Cooke, his heirs and assigns. This deed contained the usual clause of distress, and re-entry, if the rent should be in arrear thirty days, and sufficient goods and chattels should not be found upon the said premises, of which distress and sale might be made to satisfy the rent. By virtue of which deed the said Edward Ramsay entered into the said lot of land, and was seized and possessed thereof. That on the 1st day of January, 1798, there were in arrear £16 for the rent which became due on the 1st day of January, 1797, and £16 for the rent which became due on the 1st day of January, 1798. That on the 31st day of January, 1798, about fifteen minutes before the setting of the sun, the said Stephen Cooke went upon the said lot and demanded payment of the rent of £16 due on the 1st day of January, 1797, and also of the rent of £16 which became due on the 1st day of January, 1798; and continued on the said lot of ground until after the setting of the sun, and no person appearing to pay the said rent, and no goods and chattels being thereon whereof distress could be made to satisfy and pay the aforesaid rents, or either of them, the said Stephen Cooke re-entered on the said lot of ground, declaring that he did so in consequence of the said rent not being paid, and there being no goods and chattels on said lot whereof distress could be made, by virtue of the clause of re-entry contained in the aforesaid deed from the said Stephen Cooke to the said Edward Ramsay. The jury did not find that a demand was made of the rents aforesaid at any time before the said 31st day of January, 1798; nor that Nicholas Voss, the defendant, to whom Ramsay had coveyed the premises, had notice of the aforesaid demand of rent and re-entry previous to the 6th day of May, 1798. The jury found that in the summer of 1798, there was a kiln of bricks on the said lot of ground to the value of three hundred dollars, the property of the said Nicholas Voss, who during the said summer erected buildings on the lot to the value of six hundred dollars. They also found the lease, entry, and ouster.

Mr. Jones and E. J. Lee, for defendant.

This is a case of forfeiture, and therefore the plaintiff must entitle himself strictly. The jury, although they find that Alexander was seized, yet do not say of what estate. The re-entry of Doctor Cooke was not lawful. He could not re-enter for the rent due 1st January, 1797, because it does not appear that there were not goods enough on the premises within the first thirty days after the rent became due to satisfy it. It was too late to demand the rent of 1797 in January, 1798, for the purpose of creating a forfeiture. It ought to have been demanded in January, 1797. For the rent of 1798, the re-entry on the 31st of January was too soon. The rent was payable on the 1st of January. The tenant had the whole day to pay it in. On the 31st of January, the thirty days after the rent became payable had not elapsed. The thirty days ended with the 31st of January. The demand might be made on the thirtieth day after, &c., but the re-entry could not be until after the thirty days had completely expired. The demand of the rent ought to have been made on the 1st day of January, and continued until the thirty days had expired. 4 Bac. Abr. 353. For if a sufficient distress could have been made on any one of the thirty days no re-entry could be made. The jury have not found the manner of the re-entry nor the mode of demand. The verdict does not state whether there was a mansion-house on the lot, nor that the demand was made on the most public part of the lot. The demand ought to be made at the front door of the house; if there was no house it ought to be made at the most notorious part of the land. 4 Bac. Abr. 358; 1 Croke, 15. The landlord must enter the house to demand the rent, if the door be open; if there be no house, then it must be demanded at the most notorious part of the land. They cited Esp. 177, that courts lean against forfeitures.

Mr. Swann, for plaintiff.

Twenty years' possession is sufficient to support an ejectment, whether the seizin be in fee or otherwise; unless the verdict had stated it to be under a lease. The verdict does not say that the re-entry was made on the 31st, but says the demand was a quarter of an hour before sunset on the 31st, and that Dr. Cooke remained on the land until after sunset, and that afterwards he re-entered. Oates v. Brydon, 3 Burrows, 1897. It is of no consequence on what part of a lot of 40 feet by 123 the demand is made. There is no part of it on which a man may not be seen from every other part. Har. Co. Litt. 202a, note 3.

Judgment for the plaintiff.